158 So.2d 122

**BAGWELL ELECTRIC STEEL CASTINGS, INC.**

v.

**STATE DEPARTMENT OF INDUSTRIAL RELATIONS et al.**

6 Div. 891.

Court of Appeals of Alabama.

May 7, 1963.

Rehearing Denied June 18, 1963.

J. Earl Langner, Birmingham, for appellant.

J. Eugene Foster, Montgomery, for appellee Department of Industrial Relations.

Talmadge Fambrough, Pell City, for appellees Isbell and Bryant.

JOHNSON, Judge.

Bagwell Electric Steel Castings, Inc., was the employer of appellees, George W. Bry-

ant and Corbie C. Isbell. The corporation appeals a judgment of the Circuit Court of Jefferson County, Alabama, awarding unemployment compensation to the employees.

The judgment of the circuit court was rendered after trial de novo on appeal from the Board of Appeals of the Department of Industrial Relations, which had awarded unemployment compensation, from the day the strike by the employees union ended, to the employees who had filed claims with the Department. The Department was a plaintiff along with Bryant in case No. 53836–X and with Isbell in case No. 53837–X, which were tried together in the circuit court as test cases binding on all other employees in the same class with each claimant, and it is an appellee in this appeal.

■ Under the view we take of this case, the validity of this agreement between the claimants and the employer need not be decided. However, we do say that having entered into such an agreement with the claimants bringing this appeal, the *employer* will be bound by the judgment in these cases and may not hereafter contest the claims of other claimants in the same class with Isbell or Bryant.

The briefs and arguments of the attorneys treat appellant's assignments of errors jointly; therefore, we will not set out the assignments but will discuss the issues raised on this appeal without specifically indicating how each is raised before us.

The corporation was engaged in the operation of a steel casting foundry on August 8, 1960, at Leeds, Alabama. Appellant's average employment was approximately 65 to 70 employees who were members of the International Brotherhood of Boiler Makers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL-CIO and Local No. 570. Bryant and Isbell were members of this union and were regularly employed by appellant. Isbell's signature appears on employer's Exhibit "A", the collective bargaining agreement between the company and the union. This agreement was in effect on August 8, 1960, and covered the period from

August 1, 1959, to July 31, 1961. Isbell helped negotiate the agreement and was familiar with its provisions.

Bryant held the position of steward of the local union. This agreement provided in pertinent part as follows:

"There shall be no strikes, slow-downs, other work stoppages or lock-outs during the life of this Agreement until the Grievance Procedure has been exhausted. Employees engaging in work stoppages not authorized in writing to the Company by the International Union shall automatically be subject to discharge and shall forfeit all rights under this Agreement. Employees engaged in work stoppages prior to the exhaustion of the Grievance Procedure will also be automatically subject to discharge."

"The Employer retains the right, subject to the provisions of this Agreement to schedule, assign and designate work to be performed, and to hire, suspend, promote, demote, discipline or discharge for proper cause, as well as to transfer or layoff of employees because of lack of work or other legitimate reasons."

"In the event it becomes necessary to reduce the working force, it shall be on the basis of seniority within the classification involved, efficiency and ability to perform the work. Employees involved may transfer into a lower classification in which he has previously had experience with the Company on the basis of his total seniority. When the transferred employee's previous classification becomes available due to an increase in operations, he will be transferred to his previous classification."

"When the efficiency and ability of the employees are relatively equal, seniority will govern. Recall shall be in the reverse order of lay-off."

Mr. Isbell left his employment at the Bagwell Company on August 8, 1960, at 3:00 P. M., the end of his working shift. He

received a layoff notice earlier on August 8, 1960, from the superintendent, Mr. John Washburn, who gave it to him personally. There was also a written notice of the lay-off posted on the bulletin board by the company and his (Isbell's) name appeared on it. The layoff notice was effective August 12, 1960.

Mr. Isbell was a furnace operator. Mr. Bryant was a furnace operator's helper, who assisted Mr. Isbell. Mr. Isbell had been with the company about a year longer than had Mr. Bryant.

When Mr. Isbell checked the plant layoff notice on the company's bulletin board, Mr. Bryant's name was not on it, although Mr. Isbell had seniority over Mr. Bryant. Mr. Isbell understood that, under the terms of the union contract in existence between the union and the company, he should have been dropped back to a lower classification job in which he had had experience, and should not have been laid off. He had had experience as a boiler assistant or helper. This was the job that Mr. Bryant had.

The only reason given to Mr. Isbell by the company for his layoff was "reduction in force". When Mr. John Washburn, Mr. Isbell's supervisor and the company's superintendent, gave Mr. Isbell the layoff notice on August 8, 1960, Mr. Isbell told Mr. Washburn he didn't think he was to get a layoff notice; that, according to the terms of the contract, he was not supposed to get a lay-off notice, but was supposed to be able to roll back to a lower position. Mr. Washburn replied that he was just doing what he was told to do.

Mr. Isbell finished his work at 3:00 o'clock in the afternoon of August 8th, and reported back for work the next morning. When he got down on the road close to the employer's plant, there was a line of men there. He did not try to cross the line, but went on home; stayed a while and then went back. He did not attempt to go around the group of men and report for work.

On the 11th or 12th of August Mr. Isbell received a notice from the company through the mail. It was styled "Status Report." On it was marked:

"(X) Terminated—reason—on strike. Article 1, Section 3. Effective 8-9-60.

"By John Washburn"

Mr. Isbell went back to the plant several times between the 8th of August and the day he got his termination notice around the 11th of the month, but he did not try to cross the line there.

Mr. Isbell told Mr. Bryant that he was going to wait until the effective date of the layoff notice (not the dismissal notice), and then, if he did anything, he would file a grievance.

Mr. Isbell did not enter into any arrangements with other employees about what was to be done in connection with the layoff notice, "because the workers would not have been acting according to contract." They would not have been able to file a grievance until the date the layoff notice took effect, i. e., August 12th. The workers were required to follow certain grievance procedures.

Mr. Isbell understood that an aggrieved employee had to make known his grievance to his supervisor, and his supervisor had seventy-two working hours or three working days in which to investigate the matter thoroughly.

Mr. George Bryant, one of the appellees, was a furnace helper, helping Mr. Isbell, and had been working for Bagwell Company for about two years. He was present when Mr. Washburn gave Mr. Isbell the layoff slip notice. Mr. Isbell had worked there longer then had Mr. Bryant. Before the layoff he had been working with Mr. Isbell at the same furnace, Mr. Isbell as the operator, with him as the helper.

Mr. Bryant, who was the shop steward, told the men to go ahead and wait until the effective date, and file a grievance and they would fight it through the grievance, the effective date was the 12th of August.

When Bryant arrived at the company's plant on the morning of the 9th of August, there was a bunch of men, forty-five or fifty of them. They had a sign up which said they were on strike. He didn't try to cross the picket line. He also received a termination slip from the company on the 9th of August in the same language as the one which Mr. Isbell received. It showed an X by the word "terminated" and the reason as being "on strike, Article 1, Section 3." It was signed by Mr. John P. Washburn, the company superintendent, and the termination was effective August 9, 1960.

Mr. Bryant's name did not appear on the posted list of the employees to receive layoff notices, and he did not receive a layoff notice from the company.

He was present when the deputy sheriff or the police of Leeds, Alabama, brought an injunction out to the company's plant. He believed the injunction was served on the president of the local, Mr. C. P. Cummings. Mr. Cummings read the injunction to the men who were there and they all left immediately.

Mr. Bryant never was called back to work, although some of the others who participated in the strike or walkout, were called back, and Mr. Bryant was available for work after the injunction was issued.

Mr. C. F. Cummings, a former employee of the company, also last worked for the company on August 8, 1960. He was president of the local union to which the company workers belonged at that time. He also received a layoff slip. His name was also on the notice posted on the company's bulletin board. He was a molder's helper. There was one under him whose position he could have rolled back under seniority. The person whom he could have rolled, based on his seniority, did not have his name posted on the layoff list.

At the time Mr. Cummings received his slip, he had a conversation with Mr. Washburn, the company superintendent. He went to Mr. Washburn's office the evening of August 8th, and there was a notice posted on the bulletin board there. He attempted to file a grievance with Mr. Washburn, but Mr. Washburn said it would not be accepted until he got further orders from Mr. Bagwell. He said he had gotten a notice from Mr. Bagwell not to take any grievances.

The reason the men were on strike, according to Mr. Cummings' testimony, was because some of them had been there for six or seven years and had more seniority than the younger ones and they felt they should have been able to roll back, according to the contract.

The men who were gathered outside the entrance to the plant on the picket line on the morning of August 8th, said they were not working because they did not agree with the way the layoff had been handled and they could not immediately file a grievance. They were mad about the layoff notices. He (Cummings) told them that it wasn't in accordance with the contract not to let them file their grievances.

Mr. John T. Washburn, superintendent for the company, testified that his duty was running the company plant. He posted the notices on the bulletin board on the 8th of August, 1960, setting out the names of the company employees who were to be laid off. After this notice was posted on the bulletin board, he heard from some of the plant employees who were listed on the notice, protesting their layoffs. He recalled distinctly one man talking with him about it, Mr. Huey Roberson. Mr. Washburn told Mr. Roberson that the contract had not only a seniority clause, but it also had an ability clause; that the man who was not being laid off had more ability than he had. There were several employees who protested the layoffs to him, but he did not remember the names of them. Washburn testified that when he posted the notice on the bulletin board, he knew he was going to hear a lot about it from persons who were concerned. Mr. Washburn remembered having a conversation sometime during the day of Au-

gust 8th with Mr. Cummings, an employee, who was vice-president of the local union. Mr. Cummings told him he felt like he wanted to keep his job and he wanted to file a grievance. He did file a grievance with Mr. Washburn. Mr. Washburn wrote out the termination slips, dated the 9th of August, 1960, terminating the employment of all company employees who were supposed to have reported for work on August the 9th, without waiting for the seventy-two hour period in which he had to investigate any of the grievances and make a ruling on them. He wrote these termination slips on the morning of the 9th of August, when the men failed to report for work on the 6:00 o'clock shift. He had received instructions from the president of the company that, in case of a wildcat strike, he was to terminate the employment of the men, if they did not report for work. Washburn further testified that the president of the company further told him he would fire him if he did not issue the termination slips.

At the time Mr. Washburn, the company's superintendent, prepared the termination notices, he did not get the names of the men who were to be discharged from the names of the men who were on the picket line, but he got them from the company's time cards. In arriving at the list of employees who were sent termination notices, Mr. Washburn did not make an investigation to see if all the people who were terminated were actively participating in the strike. He simply took the list of all the employees.

During the trial, the judge said:

"Well, is it agreeable with all the attorneys, and if it is, we will take no further testimony. I might just content myself with trying to pass on the legal questions involved and the mechanics of the thing, and as to the amount and the signing, *and the availability* and all that sort of stuff, I will leave unless you gentlemen say otherwise. * * * Mr. Langner, would you like to expend (sic) on the testimony to take other phases, or would it be agreeable that we content ourselves

with this phase of it?" (Italics supplied.)

Mr. Langner asked the judge:

"As I understand your ruling, Your Honor, that is you feel the burden has been met to this point?"

The judge replied:

"I am not ruling on the burden of proof at all, I am trying to feel my way along to see what we will have to pass upon."

Mr. Langner replied:

"I just didn't understand you."

■ In the interest of efficient administration of the trial, the judge made a statement framing the issues and asked the attorneys to object to his action if they wished.

Counsel for appellant does not point out wherein he or opposing counsel objected. The failure to object signified the acceptance of the attorney to the statement of the trial judge as a stipulation removing certain issues, including the availability for work of Isbell and Bryant, as issues for consideration of the trial court.

■ Since the question of whether claimants had met the burden that was upon them to show their availability for work was not before the trial court, we do not consider it here. Greene v. Department of Industrial Relations, 38 Ala.App. 199, 83 So.2d 360.

■ In view of T. R. Miller Mill Company v. Johns, 261 Ala. 615, 75 So.2d 675, which is a ruling precedent for the facts in the appeal before us, the trial court was bound to decide as he did and we can do naught but affirm his judgments. Although counsel for appellant brings to our attention the fact that the contract involved in the Miller case had expired but that the Bagwell contract had not, he does not convince us that this difference between the cases is material.

Moreover, the appellant could not prevail on this appeal under its theory that the

employees are not entitled to compensation because of Title 26, Sec. 214, subd. C(1), which provides for discharge because of misconduct after written notice, because there was no written notice.

The court feels that the issues in this case are controlled by the T. R. Miller Mill Company v. Johns, supra, case and that further discussion of the issues herein are unnecessary.

Affirmed.

CATES, J., concurs in the result.

On Rehearing

JOHNSON, Judge.

■ The appellant points out to the court that our dicta in the next to the last paragraph of the original opinion concerning Title 26, Section 214, subd. C(1) indicates that written notice must be given whether the misconduct contemplated by the statute is actual or threatened. It is urged that common sense indicates that it is only after threatened misconduct, and not actual misconduct, that written notice must be given. With this we agree. However, under the view we take of this case, it is unnecessary for us to construe this part of the statute.

Appellant, in his brief accompanying his application for rehearing, sets out at length a portion of the trial concerning whether the defendants, Bryant and Isbell, should have been required at the trial to prove their availability for work. Looking at this additional part of the record, we leave our decision unaltered for we agree with the trial judge, who, during the course of the trial, stated:

"It is rather an odd situation here, for instance, you could have this sort of a thing. Suppose here, one of these two, according to the testimony was not available at all for work because of some situation peculiar to him, or what he individually had chosen to do, and suppose in his class on that list of employees, suppose there was ten or twelve others, that wanted to get the same ruling that he gets. Suppose this Court turns him down because he wasn't available, because of his own idiosyncrasy, that would be a strange thing, that the other ten, because of that thing there. Suppose he was available and the other ten were not, why should they get money because of his availability, rather than their own. It is evidently concluded that the implication to that agreement, to determine under the law, that the law and such— that these men are not entitled to recover. If I determined the law as such under the general principle, that they are entitled to recover, it seems to me inevitable that it was in the sense that I should then so hold, and assign the cases back to the department then to be calculated from the record, in their position of signing up and availability in that sort of a thing, and what the amount is to be paid to them, and I think it is inevitable and I so hold and counsel for the employer has exception to that holding."

Upon reconsideration, we are still convinced that the similarities of this case and T. R. Miller Mill Co. v. Johns, supra, are the material considerations and that the differences are immaterial.

Application for rehearing overruled.